**Charles E. BROOKS, III et al.,**

v.

**EDUCATORS MUTUAL LIFE INSURANCE COMPANY.**

No. 00–CV–3860.

United States District Court, E.D. Pennsylvania.

Feb. 13, 2002.

**98**

Joseph F. Roda, Michele S. Eagan, Roda & Nast P.C., Lancaster, PA, for Plaintiffs.

George C. Werner, Jr., Matthew H. Haverstick, Barley, Snyder, Senft & Cohen, Lancaster, PA, for Defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiffs Charles Brooks and Victoria Coniglio instituted this action on behalf of themselves and others similarly situated against Educators Mutual Life Insurance Co. ("Educators") for failing to pay for anesthesia services in accordance with its medical insurance contracts in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Plaintiffs move for class certification pursuant to Federal Rule of Civil Procedure 23 and appointment as class representatives. Additionally, they seek appointment of their attorneys as counsel for the class. I will grant the motion to certify.

## I. Background

This matter arises out of Educators' methods of paying for anesthesia services received by persons insured under its employee group health insurance policies. Based in Lancaster County, Pennsylvania, Educators sells group health insurance policies to businesses located primarily in Pennsylvania, Maryland, Virginia, and West Virginia. The group insurance policies it sells are one of two types: preferred provider organization ("PPO") policies or indemnity policies. Presently, roughly 80% of Educators' group policies are PPO policies, while the remaining 20% are indemnity policies.

Under its indemnity and PPO policies, Educators is obligated to pay the "qualifying expense" for medically necessary services and procedures. Educators' indemnity policies define "qualifying expense" as "the lesser of the actual charge or the reasonable and customary charge as determined by us." Educators' PPO policies define "qualifying expense" differently depending upon whether a PPO insured uses an "in-panel" provider or "non-panel" provider.[1] When an in-panel provider is used, Educators' PPO policies require it to pay the "qualifying expense" which is defined as the "network's allowed charge." This charge is determined according to an existing contract between Educators and the PPO. However, when a PPO insured uses a non-panel provider, Educators' PPO policies define "qualifying expense" precisely as it is defined in Educators' indemnity policies: as "the lesser of the actual charge or the reasonable and customary charge as determined by us."[2] Both its indemnity and PPO policies further define the "reasonable and customary charge" as "a charge that is not higher than the usual charge for medically necessary treatment and supplies provided in the same geographical area."

---

1. Under a PPO policy, the term "in-panel provider" refers to a medical care provider that is a member of the PPO. A PPO is a network of medical care providers with whom an insurance company contracts directly to provide medical insurance coverage for its insureds. Under such a contract, an insurance company agrees to refer its insureds to providers in the network in exchange for the providers' agreement to charge the insurance company reduced fees for medical procedures and services. A "non-panel" provider, then, refers to a medical care provider which is not a member of the PPO network and with which the insurance company has no pre-existing agreement regarding the fees it will pay, and the provider will accept, for a given medical procedure. In this regard, the relationship between a non-panel provider and the insurance company under a PPO policy is similar to the relationship between a provider and the insurance company under an indemnity policy.

2. Educators' indemnity policies provide:

 The qualifying expense for a medical procedure is the lesser of the actual charge or the reasonable and customary charge as determined by us.

 (Pls.' Motion for Class Certification, Ex. 2, 11). Educators' PPO policies provide:

 The qualifying expense for a medical procedure incurred through a non-panel provider is the lesser of the actual charge or the reasonable and customary charge as determined by us.

 (Pls.' Motion for Class Certification, Ex. 3, 11).

In this action, plaintiffs Brooks and Coniglio allege that Educators failed to pay the "reasonable and customary charge" for anesthesia services rendered to persons insured under its indemnity policies and PPO policies who used non-panel providers in accordance with the language set forth in these policies. They move to certify a class defined as:

> All persons whose anesthesia bills were paid in part by Educators at any time since September 1, 1998 under policies of insurance that: a) obligate Educators to pay "reasonable and customary" charges for anesthesia services; and b) define "reasonable and customary" as "[a] charge that is not higher than the usual charge for medically necessary treatment and supplies provided in the same geographical area." Excluded from the class are insureds of PPO policies whose anesthesia services were provided by an in-panel provider.

The proposed class, then, includes persons (1) insured under Educators' indemnity policies and Educators' PPO policies who used a non-panel provider, and (2) whose anesthesia bills were not paid in full by Educators, thus leaving them responsible for the remaining unpaid balance on the bill.

Additionally, plaintiffs propose that the class be divided into the following subclasses:

> (1) all person whose anesthesia bills were partially paid by Educators between September 1, 1998 and late February/early March 1999; and
>
> (2) all persons whose anesthesia bills were partially paid by Educators after late February/early March 1999.

This proposed division in the class tracks a change in the method employed by Educators in determining and paying the reasonable and customary charge for anesthesia services. According to plaintiffs, from September 1, 1998 to early March 1999, instead of making a determination as to the usual charge of anesthesiologists in a specific geographical area, Educators paid for anesthesia services under its group health policies by first determining the amount that the surgeon would be paid for the procedure that required the administration of anesthesia, and then paying the anesthesia provider 20% of that amount. If this amount was less than the anesthesia provider's charge, an insured was generally billed for any remaining balance by the medical provider (referred to by plaintiffs as "balance-billing"). Educators paid for the anesthesia services received by proposed lead plaintiff Brooks in this manner, and Brooks was balance-billed by his anesthesia provider for the remaining unpaid balance. Plaintiffs contend that Educators' payment of the reasonable and customary charge for anesthesia services at a flat rate of 20% violated its contractual obligations because under this method, the reasonable and customary charge was not based on the usual charge for such services in a given geographical area.

Beginning in March 1999, Educators adopted a new method of using a computer software program provided by Medicode ("Medicode program") to determine the amount it would pay for anesthesia bills for persons insured under its group plans. Educators used the Medicode program in paying the anesthesia bill of proposed lead plaintiff Coniglio. Like Brooks, Coniglio was balance-billed by her anesthesia provider for the difference between the total charge for the anesthesia services she received and the amount Educators paid. Sometime in or near June 2000, Educators switched from using the Medicode program to the Medicare program, a software program which apparently calculates the amount to be paid for anesthesia services in a manner similar to the Medicode program.[3] According to plaintiffs, Educators' use of these software programs violates its contractual obligation because the programs (1) do not specify from which geographical area their data are drawn, and (2) take into account the amount that anesthesia providers ultimately have accepted in the past as payment as opposed to what they have charged, a factor not provided for in Educators' group health policies.

---

**3.** Plaintiffs first referred to Educators' switch from the Medicode to Medicare program in their supplemental brief on class certification. From plaintiffs' statements regarding Educators' use of the Medicare program, I assume for purposes of this motion that the Medicare program operates in a similar manner to the Medicode program. Educators has not suggested otherwise.

Thus, according to plaintiffs, use of the Medicode and Medicare programs also violates Educators' contractual obligations because the programs do not calculate the amount to be paid by determining "the usual charge" for anesthesia services in a given geographical area.

## II. Federal Rule of Civil Procedure 23

To obtain certification, a class must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and 23(b). Rule 23(a) sets forth four prerequisites to class certification:

> (1) the class is so numerous that joinder is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

If these four prerequisites, commonly referred to as numerosity, commonality, typicality, and adequacy of representation, are satisfied, plaintiffs also must show that the action is maintainable under one of the three provisions of Federal Rule of Civil Procedure 23(b). In this case, plaintiffs move for class certification on behalf of the class under both Rule 23(b)(2) and (b)(3), which provide for certification when:

> (b)(2) [T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a

class action is superior to other available methods for the fair and efficient adjudication of the controversy.[4]

Fed.R.Civ.P. 23(b)(2), (3).

■ A court's consideration of whether class certification is appropriate under Rule 23 is not intended to be an inquiry into the merits of plaintiffs' claims. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166–67 (3d Cir.2001) (discussing Supreme Court cases). Where plaintiffs' claims involve complex questions of fact and law, however, it may be necessary for a court to " 'delve beyond the pleadings to determine whether the requirements for class certification are satisfied.' " *Id.* at 167 (quoting 5 Moore's Federal Practice § 23.61[5] ).

## III. Discussion

Educators does not dispute that the numerosity and adequacy of representation prerequisites of Rule 23(a) are satisfied in this case. Educators argues instead that plaintiffs have failed to satisfy the commonality and typicality prerequisites of Rule 23(a). Additionally, Educators argues that plaintiffs have met neither the requirement of Rule 23(b)(2) (appropriateness of injunctive relief), nor 23(b)(3) (predominance and superiority), thus making class certification improper. Because plaintiffs must satisfy all four prerequisites of Rule 23(a) in addition to one of the provisions of 23(b), I will consider each in turn.

### A. Rule 23(a) Prerequisites

#### 1. *Numerosity*

■ Rule 23(a)(1)'s numerosity prerequisite does not require plaintiffs to allege a certain number of class members, but only that the class be "so numerous that joinder of all members is impracticable." Fed. R.Civ.P. 23(a)(1). As the Third Circuit recently held, a class consisting of more than

---

4. Fed.R.Civ.P 23(b)(3) also lists four factors to be considered in relation to the determination of whether the predominance and superiority requirements are satisfied:

> The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and

nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

forty people generally satisfies the numerosity prerequisite. *See Stewart v. Abraham,* 275 F.3d 220, 227–28 (3d Cir.2001) ("Generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met"). *See also Eisenberg v. Gagnon,* 766 F.2d 770, 785–86 (3d Cir.1985) (allegation of 91 class members satisfies numerosity). Here, while the actual number of class members is unknown, plaintiffs allege that the class could consist of hundreds, possibly thousands of insureds. Educators has not challenged plaintiffs' representations as to numerosity. Therefore, I find that they have satisfied this requirement.

#### 2. *Commonality*

■ Defendant opposes class certification for lack of commonality. The threshold for satisfying the commonality as well as the typicality prerequisites of Rule 23(a) is not high. *See Newton,* 259 F.3d at 183 ("We have set a low threshold for satisfying [the commonality and typicality] requirements"). The Third Circuit has held that the commonality requirement is not stringent, and that a *single* common issue of law or fact suffices. *See Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 184 (3d Cir.2001); *Baby Neal v. Casey,* 43 F.3d 48, 56, 61 (3d Cir. 1994). That requirement is met here.

In their First Amended Complaint, plaintiffs allege the following common questions:

(1) How Educators determined "reasonable and customary" charges for anesthesia;

(2) How Educators' policies defined "geographical area";

(3) What the "usual" charges for anesthesia services were in the same geographical area; .

(4) Whether there was a reasonable basis for Educators' approach to paying anesthesia bills;

(5) Whether Educators acted with reckless disregard for plaintiffs' rights; and

(6) Whether Educators breached its obligation to pay "reasonable and customary" anesthesia charges by paying for anesthesia services under the practices that Educators has followed since September 1, 1998;

■ To certify, I need only find *one* common question of law or fact. Whether Educators engaged in a course of conduct or practice of paying for the anesthesia services of class members at some flat fee (20% of the surgeon's fee), or a fee that ignored the contractually-specified criteria for calculating reimbursements (through the use of the Medicode and Medicare programs) in violation of their contractual obligations, as the Amended Complaint alleges, constitutes "a factual and legal claim common to the entire class." *Johnston,* 265 F.3d at 184.

The fact that this case involves a single claim under ERISA, 29 U.S.C. § 1132(a)(1), also supports a finding that the commonality prerequisite is satisfied. Unlike a diversity-based class action, where a court must apply varying state laws for class members from different states, uniform federal law will apply to all class members here. *See Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 627 (3d Cir.1996) (the need to apply an individualized choice of law analysis to individual class members contributed to the finding that commonality and predominance requirements were not met).

■ Educators argues that plaintiffs cannot satisfy the commonality prerequisite because each class member presents individualized issues regarding liability. It is well-settled that the existence of individualized issues in a proposed class action does not *per se* defeat commonality. *See Johnston,* 265 F.3d at 191 (quoting *In re the Prudential Ins. Co. of Am. Sales Practices Litigation,* 148 F.3d 283, 315 (3d Cir.1998)). *See also In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litig.,* 55 F.3d 768, 817 (3d Cir.1995) (individualized determinations of damages do not preclude a finding of commonality). While individualized issues are, without question, a factor that a court must consider in deciding whether or not to certify a class, they are more appropriately addressed under the stricter Rule

23(b)(3) predominance requirement.[5] Because plaintiffs have alleged at least one common question of fact and law pertaining to the entire class, I find that they have satisfied the commonality prerequisite of Rule 23(a).

### 3. *Typicality*

■ The third prerequisite of Rule 23(a) requires that the claims of the class representatives be "typical" of the claims of the remaining class members. Typicality is *not* identicality. *See Johnston v. HBO Film Management, Inc.*, 265 F.3d at 184. The purpose of the typicality requirement is to ensure that the interests of the class representatives are aligned with those of the class as a whole. *See In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir.1998). " 'Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.' " *Newton*, 259 F.3d at 184 (quoting 1 Newberg on Class Actions § 3.15, p. 3–78). *See also Georgine*, 83 F.3d at 631 (typicality is a bar to class certification "where the legal theories of the named representatives potentially conflict with those of the absentees"); *Baby Neal*, 43 F.3d at 58.

■ To the extent that there are differences among the claims of class members that implicate typicality, a court may create subclasses. *See Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985). Here, plaintiffs propose two subclasses. The first subclass covers insureds who were treated for anesthesia between September 1, 1998 and March 1999. During this time frame, Educators was allegedly using the 20% cap to determine its payments for anesthesia services. Plaintiff Brooks will represent this subclass, as a 20% cap was applied in his case. The second subclass covers insureds who were treated

with anesthesia after March 1999, at which time Educators began to use the Medicode program (and later the Medicare program) to determine payments. Plaintiff Coniglio will represent this subclass, as the Medicode program was used in her case.

■ Educators initially objected to typicality on the ground that Brooks and Coniglio, insured under Educators' employee benefit plans, were not typical of the proposed class because the class potentially included insureds who were covered under non-employee benefit plans. The difference in the type of plan under which class members are or were insured was legally significant due to the fact that plaintiffs initially brought three different claims against Educators: an ERISA claim, a breach of contract claim, and a bad faith claim. Only persons insured under employee benefit plans may bring an ERISA claim. Under ERISA and the law of this Circuit, a person who brings an ERISA claim is preempted from bringing a breach of contract claim and bad faith claim against an insurer. *See e.g., Norris v. Continental Cas. Co.*, 2000 WL 877040, *1 (E.D.Pa. June 28, 2000). Thus, Educators initially argued that Brooks and Coniglio's claims against Educators were not typical of the claims of non-employee benefit plan insureds because Brooks and Coniglio could bring only the ERISA claim while non-employee benefit plan insureds could bring only the contract and bad faith claims.

Educators' objection to typicality was rendered moot, however, by plaintiffs' voluntary withdrawal of the breach of contract claim and my dismissal of the bad faith claim against Educators. Plaintiffs agreed to dismiss the breach of contract claim in light of evidence submitted by Educators that it issues only employee benefit plans. I dismissed plaintiffs' bad faith claim in light of the current state of the law in this Circuit that such claims are preempted by ERISA,

---

**5.** Recognizing that the commonality and predominance requirements are linked, courts in this Circuit, including the Third Circuit, on occasion have considered these two requirements simultaneously in conducting the class certification inquiry. *See e.g. Georgine*, 83 F.3d at 626 (3d Cir.1996) ("Because 23(b)(3)'s predominance requirement incorporates the commonality re-

quirement, we will treat them together"). However, because plaintiffs must satisfy both requirements, and in light of the different standards that apply to these two requirements, I will consider them separately. *See Johnston*, 265 F.3d at 184 (addressing commonality and predominance separately).

as set forth in my Explanation and Order dated April 9, 2001. Brooks and Coniglio now seek relief only under ERISA for persons insured under Educators' employee health plans. Educators' initial objection to typicality, therefore, no longer applies.

▮ I find that the typicality requirement is met in this case. In light of the dismissals of the contract and bad faith claims, this action now proceeds under a common legal theory, that Educators failed to pay for anesthesia services of the class in accordance with its own policies in violation of ERISA. Thus, there is no conflict between the legal theories of the named representatives and putative class members. *See Georgine*, 83 F.3d at 631.

While factual differences among the individual claims of class members may exist, specifically between indemnity insureds and PPO insureds, the record to date does not establish that these differences are so great or overwhelming as to defeat typicality.[6] Proposed lead plaintiffs Brooks and Coniglio seek to represent insureds like themselves, whose anesthesia bills were not paid by Educators based on a determination of the reasonable and customary charge in the manner required under Educators' own written policies. To the extent Educators paid *in part* for the anesthesia services of PPO insureds who used an out-of-panel provider either by reimbursing the provider at a 20% flat fee or through the use of the Medicode or Medicare computer programs, Brooks and Coniglio's claims are typical of the claims of these PPO insureds. This is an action "challenging the same unlawful conduct which affects both the named plaintiffs and the putative class" and, therefore, "satisf[ies] the typicality requirement irrespective of the varying fact patterns underlying the individual claims." *Baby Neal*, 43 F.3d at 58. In consideration of the low threshold set by Rule 23(a)'s typicality prerequisite, I find that plaintiffs have satisfied this prerequisite.

#### 4. *Adequacy of Representation*

▮ Under Rule 23(a)(4), Brooks and Coniglio must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This prerequisite requires a court to assess whether any conflicts of interest exist that would prevent both the named plaintiffs and their attorneys from representing the class adequately. *See Johnston*, 265 F.3d at 185. Educators raises no such objection. In light of my conclusion that the claims of Brooks and Coniglio are typical of the class, I foresee no conflict of interest that would prevent the named representatives from protecting the interests of the class. *See id.* Regarding the qualifications of proposed class counsel, Joseph F. Roda and the law firm of Roda & Nast, P.C., there is nothing before me to suggest that counsel will not vigorously pursue this class action for all class members. *See In re the Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d at 313 (affirming district court ruling that class counsel adequately represented the class where class counsel and class representatives vigorously pursued the class). Thus, I find that the adequacy of representation prerequisite also is met.

### B. Rule 23(b) Requirements

In addition to satisfying all four of the Rule 23(a) requirements, plaintiffs also must meet *one* of the Rule 23(b) requirements. Plaintiffs move to certify under Fed.R.Civ.P. 23(b)(2), which requires plaintiffs to show that Educators "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole." Plaintiffs also move under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." I find that

---

**6.** Educators has not directly raised an objection to typicality on the ground that factual differences exist among the claims, or between PPO and indemnity policy insureds, which render Brooks and Coniglio's claims atypical of the class. Instead, Educators raises this argument in support of its position that plaintiffs have not satisfied the predominance requirement of Rule 23(b). However, for the sake of completeness, I address it here briefly.

the plaintiffs have satisfied Rule 23(b)(3) but not 23(b)(2).

#### 1. *Rule 23(b)(2)*

Plaintiffs assert that this class action is maintainable under Rule 23(b)(2) because they seek, in addition to monetary damages, a declaratory judgment and a permanent injunction requiring Educators to pay for all future anesthesia services based on the reasonable and customary charge as defined in its policies. The fact that plaintiffs seek injunctive relief alone is not sufficient to obtain certification under Rule 23(b)(2). The Third Circuit has held that class certification under 23(b)(2) is not appropriate when a class seeks primarily money damages. *See In re School Asbestos Litigation*, 789 F.2d 996, 1008 (3d Cir.1986) (affirming denial of Rule 23(b)(2) class certification on the ground that the relief sought related predominantly to money damages), *aff'g* 104 F.R.D. 422, 438 (E.D.Pa.1984); Fed.R.Civ.P. 23, advisory committee's note.

 The face of plaintiffs' Amended Complaint strongly indicates that this action is first and foremost an action for money damages. *See In re Asbestos School Litigation*, 104 F.R.D. at 438 (Rule 23(b)(2) certification not appropriate where "[d]espite the ingenuity of plaintiffs' claims for equitable remedies, this case remains at bottom, one for legal damages"). The proposed class here is defined in terms of insureds whose anesthesia claims have already been processed and paid by Educators in a way that plaintiffs claim entitles them to monetary relief. The section of the Amended Complaint setting forth the requested relief lists monetary damages first (including punitive damages) and injunctive relief last. Lead plaintiffs Brooks and Coniglio both seek money damages. This is clearly not a case where plaintiffs seek primarily injunctive relief. *Compare Baby Neal*, 43 F.3d at 58 (Rule 23(b)(2) met "in actions primarily seeking injunctive relief"). I find that in light of the

nature of plaintiffs' claim, Rule 23(b)(2) certification is not appropriate in this case.[7]

#### 2. *Rule 23(b)(3)*

Under Rule 23(b)(3), plaintiffs must show both that common questions predominate and that a class action is the superior method for adjudicating their claims.

##### a. *Predominance*

Although the predominance requirement is far more demanding than the commonality prerequisite of Rule 23(a), *see Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), a predominance of common questions does not require a unanimity of common questions. Rather, it requires that common questions outweigh individual questions. *See Johnston*, 265 F.3d at 185; *Newton*, 259 F.3d at 187. The purpose of the predominance requirement is to insure that the proposed class is "sufficiently cohesive to warrant certification." *Newton*, 259 F.3d at 187. Courts have found that the predominance requirement is satisfied in cases where the class alleges a common scheme or course of conduct. *See id.* at 189 (citing cases); *In re Prudential Ins. Co. of Am. Sales Practices Litigation*, 148 F.3d at 314 (affirming district court finding of predominance where class members alleged "a common scheme" of fraud).

 The heart of plaintiffs' claim is that Educators engaged in a common scheme to pay anesthesia bills based on mechanical formulae that ignored the criteria specified in Educators' written policies. Plaintiffs will attempt to establish liability by proving that from September 1, 1998 to March 1999, Educators paid the anesthesia bills of all class members at a flat rate, and from March 1999 to the present, Educators paid such bills using one of two similarly-operated computer programs which took into account factors not specified in its policies. Thus, for each sub-

---

7. I note, however, that my denial of Rule 23(b)(2) certification is not a finding that plaintiffs are not entitled to, or cannot sustain a claim for, injunctive and declaratory relief. As the district court noted in *In re Asbestos School Litigation*, 104 F.R.D. 422, 439 (E.D.Pa.1984), "It is, however,

well settled that certification under 23(b)(3) does not preclude the granting of appropriate equitable relief." Whether or not plaintiffs are entitled to such relief is a determination to be made at a later stage of the litigation.

class, liability is predicated upon what plaintiffs allege was a common improper method of calculating the reasonable and customary charge.

Educators argues that the class claim presents individualized issues that overwhelm any issue common to the class, thus defeating predominance. While Educators has not provided an explicit list of what these individualized issues are, its briefs raise four primary arguments for why predominance is not met in this case: (1) the amount Educators pays for anesthesia services is made on a discretionary, case-by-case basis; (2) whether insureds are balance-billed varies on a case-by-case basis; (3) the process of determining the amount it pays for anesthesia services for PPO insureds differs greatly from the process in which Educators engages for determining such payments for indemnity policy insureds; and (4) pursuant to the language of its policies, the reasonable and customary charge is dependent on, and, therefore, varies by geographical area. I consider each argument below.

First, Educators asserts that the very language of both its indemnity and PPO policies makes clear that the determination of the amount to be charged for a medical service such as anesthesia is a discretionary decision. Under both Educators' indemnity policies and PPO policies when a non-panel provider is used, qualifying expense is defined as "the lesser of the actual charge or reasonable and customary charge *as determined by [Educators]*" (emphasis added). Therefore, Educators argues, because its determination of what to pay as the reasonable and customary charge is, according to its own policies, a discretionary decision, adjudication of the class claim will require individualized determinations of liability for each class member.

Educators' argument, however, completely ignores both the language in its insurance policies as well as plaintiffs' claim. While it is true that Educators' indemnity and PPO policies state that the reasonable and customary charge is to be "determined by [Educators]," both policies also require it to determine this charge in relation to the "usual charge [for anesthesia services] provided in the same geographical area." Thus, whether or not Educators must base the determination of the reasonable and customary charge upon the usual charge for such services in a given geographical area, and not upon some other factor or criterion, is *not* a discretionary decision. Its policies obligate it to do so. That it did not do so is the basis of the class claim.

Furthermore, plaintiffs have produced sufficient evidence to undermine Educators' contention that its determination of the reasonable and customary charge is, in fact, made on a case-by-case, individualized basis. Janis Shedenhelm, the Director of Clinical Risk Management for Educators, testified at deposition that (1) until February 1999, Educators paid for anesthesia services at a rate of "20% of what the surgeon's reasonable and customary allowance was" and (2) after February 1999, Educators used the Medicode software program, whose data incorporate the amounts that a provider has accepted in the past as reimbursement (a criterion not included in Educators' definition of a reasonable and customary charge), to calculate what it would pay on a claim. (Dep. of Janis K. Shedenhelm, 15, 59). Thus, Educators' assertion that its determination of what to pay as the reasonable and customary charge is made on case-by-case, discretionary basis is belied both by the language in Educators' policies and the factual record to date.[8]

Second, Educators claims that the fact that some providers accept an amount less than the actual charge as payment in full and do

8. This finding is in accordance with the Third Circuit's recent opinion on class certification in *Johnston v. HBO Film Management, Inc.,* 265 F.3d 178 (3d Cir.2001), in which it held that "not only was it appropriate, but also necessary, for the district court to examine the factual record underlying plaintiffs' allegations in making its certification decision." *Id.* at 189. In affirming the district court's finding that the plaintiffs in *Johnston* failed to establish predominance due to the existence of individual issues of liability, the Third Circuit noted that "the record simply does not support [plaintiffs'] claims [regarding the defendant's uniform misrepresentations]." *Id.* Here, unlike in *Johnston,* the record to date supports plaintiffs' allegations that Educators paid the anesthesia bills of its group policy insureds not on an individualized basis, but through the use of a standardized calculation or formula.

not balance bill the insured for the remaining unpaid balance defeats a finding of predominance because such a practice again will require an individualized analysis of class members' claims. Plaintiffs agree that insureds whose providers explicitly agreed not to balance bill them do not belong in this class because their bills would not be paid "in part" as the proposed class definition requires. However, according to plaintiffs, providers who chose not to balance bill insureds, but operated under no explicit agreement to that effect, may still seek the remaining amount from these insureds. Thus, plaintiffs argue, these insureds should not be excluded from the class.

While plaintiffs may be correct that some insureds whose bills were paid only in part face the possibility that they may be balance-billed in the future, I fail to see, and plaintiffs have failed to explain, what injury these insureds have suffered *today* if they have not actually been billed. Any claim for future damages for these plaintiffs would be speculative. Educators argues that the presence of these insureds in the class precludes a finding that predominance is met and, therefore, that class certification is appropriate. Educators' argument goes too far. Whether or not class members were balance-billed is an issue that is relevant at the damage stage of the litigation. Because of the potential difficulty in identifying which class members were balance-billed for purposes of providing notice to the class, I will not limit the class at this time.[9]

Educators' third argument against predominance is that the payment of claims under its PPO policies presents issues of fact distinct from the payment of claims under its indemnity policies, further precluding a finding that the predominance requirement is satisfied. This objection has been addressed in part by excluding from the class any per-

son insured under a PPO policy that received anesthesia services from an in-panel provider, in recognition of the fact that the bills of such insureds are paid pursuant to a predetermined "network" fee. Thus, only indemnity insureds and PPO insureds who used non-panel providers are included in the class. For these two types of insureds, Educators' policies obligate it to pay "the reasonable and customary charge" defined as "a charge not higher than the usual charge for [anesthesia services] provided in the same geographical area."

Despite this identical language in its indemnity and PPO policies, Educators contends that significant differences exist in how Educators processes the claims of indemnity policy insureds as opposed to PPO policy insureds who used non-panel providers. According to Educators, in paying the bill of a PPO insured who used a non-panel provider, it takes into account such considerations as whether the procedure was medically necessary or whether the insured was referred to a non-panel provider. (Kimberly Rankin Affidavit, ¶ 12). However, in Ms. Rankin's own deposition testimony incorporated into the record by plaintiffs, she stated that in processing the claim of a PPO insured who uses a non-panel provider, Educators makes a determination as to what the reasonable and customary charge is for that insured.[10] (Pl.'s Supplemental Memorandum of Law, Ex. 1, pg. 12). Educators itself acknowledged in its supplemental brief on class certification that "in processing some [claims from non-panel providers under a PPO policy], Educators at some point utilized a 'reasonable and customary' analysis similar to the analysis used in processing claims under an indemnity policy." (Educators' Supplemental Memorandum, 5). While Educators strenuously objects to any contention that it utilized the reasonable and customary in processing *ev-*

9. If, however, the information necessary to determine which class members were balance-billed is available at this time, I will entertain a motion by Educators to limit the class to those insureds who were balance-billed.

10. Rankin also stated in her deposition that Educators sometimes negotiates a fee with an non-panel provider who provided anesthesia services to a PPO insured and pays that amount, not the

reasonable and customary charge. Educators points to this practice as further evidence that it handles the claims of PPO insureds and indemnity insureds in a strikingly different manner. However, as I understand plaintiffs' position, a PPO insured whose bill was paid based on a negotiated fee would not be eligible for the class because the bill of such an insured would not be paid "in part."

ery claim of a PPO insured who used a non-panel anesthesia provider, at this stage of the litigation, I will not deny class certification, nor exclude this entire group of insureds from the class, when the evidence before me is not conclusive as to how Educators goes about paying the anesthesia bills of any of its group insureds.

Educators' fourth and final ground for opposing predominance is that the determination of how much to pay for anesthesia services differs by geographical area, as required by the definition of the reasonable and customary charge as "[a] charge that is not higher than the usual charge for medically necessary treatment and supplies provided *in the same geographical area* " (emphasis added). Educators sells its group policies to businesses in Pennsylvania, Maryland, Virginia, West Virginia and other states. Thus, Educators argues, plaintiffs will have to present evidence of the usual charges for anesthesia services in potentially hundreds or thousands of medical markets. In response, plaintiffs contend that determining what anaesthesiologists usually charge on a geographical basis and whether the amounts paid by Educators met this standard are not complex, arduous tasks and can be accomplished using "simple mathematical calculations."

Whether the language in Educators' policies requiring it to make "regional" determinations of what anesthesia services cost is enough to defeat the predominance requirement is not clear from existing case law. In a comparable situation, the Third Circuit ruled in *In re Prudential Ins. Co. of Am. Sales Practices Litigation*, 148 F.3d 283 (3d Cir.1998), that class certification of a nationwide class was proper even though varying state laws would have to be applied to the class' claims. *See id.* at 315. The Third Circuit found that the plaintiffs satisfied the predominance requirement because they had demonstrated with "comprehensive analysis" that the variance in state laws did not present "insuperable obstacles" to class management. *Id.* (quoting *In re School Asbestos Litigation*, 789 F.2d 996, 1010 (3d Cir.1986)). *Cf. Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627 (3d Cir.1996) (distinguishing *In re School Asbestos Litigation* in a case where states' laws and regulations could not be broken into a small numbers of patterns), *aff'd Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Thus, *In re Prudential Ins. Co.* suggests that the fact that the adjudication of the class claim may involve analysis of anesthesia charges on a regional basis should not, alone, defeat predominance.

Citing the Third Circuit's decision in *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124 (3d Cir.2000), Educators contends that plaintiffs cannot meet the predominance requirement because they cannot show that a single, objective formula exists "to analyze and resolve *every* claim from *all* relevant geographical areas." (Educators' Sur Reply to the Motion for Class Certification, 2). The class in *Holmes* brought an ERISA claim against a pension plan seeking interest on wrongfully delayed pension benefits. The district court denied class certification in part on the ground that the adjudication of plaintiffs' claims necessitated individualized determinations of the amount of interest to which each class member was entitled that could not be made using a single, common formula. *See id.* at 137. While the Third Circuit affirmed, it made clear that the individual determinations necessitated by the *Holmes* class were not a matter of calculating damages, but were necessary in order to establish the defendant's liability to each class member. *See id.* at 137–38 ("the issue of liability itself requires an individualized inquiry into the equities of each claim").

*Holmes* is distinguishable from this case. At issue here are *regional* determinations as to how much an anesthesia provider usually charges, not determinations regarding Educators' liability to each individual class member. More importantly, plaintiffs here allege that Educators did not determine what the usual charges were for anesthesia services in a given geographical area. To deny class certification on the ground that the adjudication of the class claim will involve the review of "hundreds or thousands" of medical markets in order to determine what the "usual charges" were for class members, when the

very basis of plaintiffs' claim is that the determinations were never made, defies common sense. Although the calculation of damages in this case may necessitate a region-by-region determination of the usual charge for anesthesia services, it is well settled that " 'the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.' " *Holmes*, 213 F.3d at 137. I find that the language in Educators' group policies requiring it to make payment determinations on a geographical basis does not defeat predominance.

### b. *Superiority*

■ To be maintainable as a class action, Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). *See In re Prudential Ins. Co.*, 148 F.3d at 316. Here, the class action device is a superior method of adjudication because it will: (1) prevent a multiplicity of suits that would waste judicial resources (the same basic issues will have to be relitigated), (2) avoid the risk of inconsistent judgments, and (3) enable plaintiffs with small claims to get into court. *See Georgine*, 83 F.3d at 633 (class action appropriate where plaintiffs' damage claims are small and, thus, plaintiffs do not have a "significant interest in individually controlling the prosecution of separate actions"). Here, Brooks and Coniglio seek compensation for the unpaid balance of their anesthesia bills, in the amounts of $885.60 and $332, respectively. Assuming that the damage claims of lead plaintiffs' Brooks and Coniglio are representative of the class, they are not of such a great magnitude as to give each class member a vital interest in controlling the outcome of the litigation.

While Educators has not argued directly that the superiority requirement is not met, I note that its objections to predominance on the ground that the class will suffer from management problems would apply here as well. Yet, as was discussed in regard to the predominance requirement, the record before me does not allow me to conclude that the adjudication of the class claim will require individual determinations of liability. *Cf. In re LifeUSA Holding Inc.*, 242 F.3d 136, 148 (3d Cir.2001) (class action method not superior where class size could exceed 250,000 and the class' claims necessitated individualized inquiry into representations made by the defendant's agents to each class member). At this stage of the case, it cannot be said that the differences among putative class members, which have been identified by Educators, present "difficulties...in the management of this action [that] are insurmountable." *Id.* at 632. I find that the superiority requirement of Rule 23(b)(3) is satisfied.

### IV. Conclusion

I find that class certification is appropriate in this case. Plaintiffs have satisfied all four prerequisites of Rule 23(a) as well as the requirements of Rule 23(b)(3). An appropriate order follows.

### *ORDER*

**AND NOW**, this 13th day of February 2002, it is **ORDERED** that:

(1) Plaintiffs' Motion for Class Certification (Docket # 8) is GRANTED;

(2) A class is certified pursuant to Fed. R.Civ.P. 23(b)(3), defined as:

All persons whose anesthesia bills were paid in part by Educators at any time since September 1, 1998 under policies of insurance that (1) obligate Educators to pay "reasonable and customary" charges for anesthesia services, and (2) define "reasonable and customary" as "[a] charge that is not higher than the usual charge for medically necessary treatment and supplies provided in the same geographical area." Excluded from the class are insureds of PPO policies whose anesthesia services were provided by an in-panel provider.

Additionally, the class shall be divided into the following subclasses:

(1) all person whose anesthesia bills were partially paid by Educators between September 1, 1998 and late February/early March 1999; and

(2) all persons whose anesthesia bills were partially paid by Educators after late February/early March 1999.

(3) Plaintiffs Charles E. Brooks, III and Victoria Coniglio are certified as representatives of the class;

(4) Plaintiffs' counsel, Joseph F. Roda, Esq. is appointed lead counsel for the class.